IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHERRYL BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  2:05cv835-CSC |
| | ) | (WO) |
| AUBURN UNIVERSITY AT | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

The plaintiff, Sherryl Byrd ("Byrd"), brings this action pursuant to the Equal Pay Act,

29 U.S.C. § 206(d)(1), and  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e against her former employer, Auburn University at Montgomery ("AUM").  She

alleges that she was paid less and discriminated against because of her gender, and that she

was retaliated against after complaining about salary inequities.

The court has jurisdiction of the plaintiff's claims pursuant to the jurisdictional grants

in 42 U.S.C. § 2000e-5 and 29 U.S.C. § 216(b) as well as its federal subject matter

jurisdiction, 28 U.S.C. § 1331.  Now pending before the court is the defendant's motion for

summary judgment (doc. # 26).[1]  The plaintiff filed a response in opposition to the motion

for summary judgment to which the defendant has replied.  After careful review of the

---

[1] Also pending is the defendant's motion to strike new contentions (doc. # 42).  Because the court concludes that the defendant's motion for summary judgment is due to be granted, the court pretermits discussion of the motion to strike (doc. # 42) and will simply deny it as moot.

defendant's motion for summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials, the court concludes that the defendant's motion for summary judgment should be granted.

## II.  THE SUMMARY JUDGMENT STANDARD

Under   FED. R. CIV. P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of

---

[2]  In *Celotex Corp.v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial...We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . .

*Id.* at 324.

2

proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993);  *see also*  FED. R. CIV. P. 56(e). ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact "is 'genuine' . . .  if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant.  *See  Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995).  However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if

there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law  FED. R. CIV. P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

### III.  FACTS[3]

In 1997, Dr. Byrd was hired by Auburn University Montgomery ("AUM") as the Assistant Vice Chancellor for Student Affairs.  Her beginning salary was $60,000.  Prior to Byrd's employment with AUM, Darold Dunlavy held the position of Vice Chancellor for Student Affairs.  In this capacity, Dunlavy reported directly to the Chancellor.  Dunlavy retired in 1995.  Dunlavy started work at AUM in 1971, and, at retirement, his salary was approximately $67,000.  After Dunlavy retired, the position of Vice Chancellor for Student Affairs was eliminated.  In 1997, Dr. Roger Ritvo, the Vice Chancellor for Academic Affairs absorbed the duties of the Student Affairs division and his title was changed to Vice Chancellor for Academic and Student Affairs.

As Assistant Vice Chancellor for Student Affairs, Byrd reported to the Vice Chancellor for Academic and Student Affairs until June 2, 1999, when Chancellor Roy Saigo directed Byrd to report directly to him.  Because she reported directly to the Chancellor, Byrd also served on the Executive Council.[4]

Shortly thereafter, Saigo left AUM.  In January 2000, Dr. Guin Nance became

---

[3]  On a motion for summary judgment the court must construe the facts in the light most favorable to the non-movant who, in this case, is the plaintiff.  *See, e.g. Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990).

[4]  Only those individuals who report directly to the Chancellor serve on the Executive Council.

Chancellor.[5]  On January 14, 2000, Nance instituted an organizational restructuring which included "[r]einstituting the reporting line of the Assistant Vice Chancellor for Student Affairs to the Vice Chancellor for Academic and Student Affairs."  (Def's Ex. A-7).  As a result of the reorganization, Byrd no longer served on the Executive Council.  (*Id.*).

In the spring of 2004, Byrd began advocating for several of employees under her supervision to receive position and salary reviews.  At the same time, a salary compensation study for support and clerical staff was being conducted.[6]  Upon completion of the salary compensation study, Byrd supported several of her employees' appeals of their salary placements.

On June 29, 2004, Byrd presented Debra Foster, the Director of Human Resources, a written complaint of pay disparity challenging Byrd's own salary.  Byrd compared herself to Paul Alexander, the Executive Director of Advancement and Alumni Services, and to Darold Dunlavy, her predecessor.  In support of her complaint, Byrd created several documents describing her job duties and comparing her position to Alexander's position.  She also created a comparison chart in which she listed salary information culled from AUM's budget books.  She included data from CUPA[7] and NASPA[8] to support her position

---

[5]  Nance was Chancellor from January 2000 until her retirement on September 1, 2006.  (Def's Ex. 1).  Prior to her appointment as Chancellor, and during her tenure at AUM, Nance served as an English Professor, Dean of the School of Liberal Arts, Vice Chancellor of Academic Affairs, and Interim Chancellor. (*Id.*)

[6]  It is undisputed that Byrd's position, as an administrator, was not part of the compensation study.

[7]  CUPA is the College and University Professional Association for Human Resources.

[8]  NASPA is the National Association of Student Personnel Administrators.

5

that she was underpaid.  According to Byrd, her salary each year since 1997 has been as follows:

| | | |
|---|---|---|
| 1997-1998 | $60,000 | |
| 1998-1999 | $67,000 | |
| 1999-2000 | $70,650 | |
| 2000-2001 | $74,000 | |
| 2001-2002 | $74,000 | (no employees received raises this year) |
| 2002-2003 | $77,700 | |
| 2003-2004 | $77,700 | (no employees received raises this year) |
| 2004-2005 | $81,000 | |
| 2005-2006 | $88,000 | |

After conducting an investigation,[9] Foster concluded that Byrd had not been discriminated against in her pay because of her gender.  (Def's Ex.C).  Foster notified Byrd of the results on her investigation on July 29, 2004.  (Def's Ex. C-2).

Byrd filed a charge with the EEOC on November 4, 2004, alleging gender discrimination in pay.  She complained that Foster did not conduct a thorough investigation and reiterated her concern that women were paid less than men at AUM.

On December 14, 2004, Byrd received an email from her supervisor, Vice Chancellor for Academic and Student Affairs Dr. Ritvo, entitled "Whose Job Is It?"  The email came on the heels of several conversations and a meeting between Byrd and Ritvo regarding the staff compensation study and Byrd's efforts to assist her employees in their appeals of their initial classifications under the study.  In his email, Ritvo referred to Byrd's request that he intervene to secure a higher starting salary for a senior director for enrollment services

---

[9]  Although Byrd disputes the thoroughness of the investigation, it is undisputed that some investigation was undertaken by Foster.

candidate.  (Byrd Dep. at 120).

> As I thought about our meeting, I have a reaction to your plea that I speak to Debra Foster about the proposed salary for the candidate.  One of your consistent themes is that you are indeed an Assistant vice Chancellor and in charge of the daily operations of the units that report to you.  Yet, on this matter, I assume your reluctance to speak directly with the HR director is that you and Debra have crossed swords and that you do not feel you can be effective.

> Is this a correct assumption on my part?  If so, then I think you and I need to develop an approach to resolve the matter.  I should not be your communicator to the campus and rebuild bridges need to be repaired.  This is a theme you and I have discussed before in regards to Jackie Roberts, the Chancellor and now HR.  The pattern and the specifics are worrisome since these are the people I have to deal with on a daily basis.

> Please let me know your thoughts and let's chat before either of us calls HR about salary offers.

(Def's Ex. G).  Byrd interpreted this email as an attempt to hinder her ability to advocate for

her employees and describes this email as an act of retaliation.   (Byrd Dep. at 78)

Prior to 2004-2005, Byrd's position was reported to CUPA as Chief Student Affairs

Officer.[10]  In 2004, Byrd's position was reported to CUPA as the Associate Chief Student

Affairs Officer.[11]  According to Foster, the reporting change was made because AUM

realized that several positions were incorrectly reported to CUPA.

On June 15, 2005, Byrd received a memorandum from Jackie Roberts, Vice

---

[10] CUPA defines the Chief Student Affairs Officer as the "[s]enior administrative official responsible for the direction of student services and student life programs.  Typically supervises student counseling and testing, career development and placement, student union, campus/student activity, minority student support program, residence life, and related functions."

[11] CUPA defines the Associate Chief Student Affairs Officer as the "[s]econd senior officer responsible for the direction of student services and student life programs."

Chancellor for Financial and Administrative Services.   In the memorandum, Roberts questioned a projected deficit of $300,000 in a scholarship account.  Roberts asked Byrd to "[p]lease let me know how you plan to address the current year deficits and plan to prevent deficits in future years."  As a result of the projected deficit, scholarship accounts were combined and oversight of that account was transferred to the business office.

Byrd filed this lawsuit on August 29, 2005. In September 2005, Dr. Ritvo completed Byrd's evaluation.  According to Byrd, this was only her second formal evaluation by Dr. Ritvo during his eight year tenure as her supervisor.  Dr. Ritvo gave Byrd an overall "commendable" rating, and she received an 8.6% pay raise. Nonetheless, she considered Ritvo's comments on her evaluation to be negative.

On September 15, 2005, Roberts' administrative assistant, Amy Teague, emailed directors and administrators information regarding their staffs' proposed raises for the 2005-2006 year.  Byrd did not receive the email.  After complaining, on September 20, 2005, Teague forwarded the email to Byrd with the following notation "Sorry for the omission. Have a great afternoon."

Byrd retired from AUM on June 30, 2006, effective August 1, 2006.

## IV.  DISCUSSION

### A. Disparate Pay Claims

Byrd alleges disparate pay claims under the Equal Pay Act and Title VII.  Specifically, Byrd alleges that during her tenure as Assistant Vice Chancellor for Student Affairs, she did not receive a salary which was commensurate with the salaries of her male colleagues.

> Gender-based discrimination in rates of pay to employees, whether male or female, is prohibited by the Equal Pay Act of 1963, which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d) (1976), as well as by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  The Equal Pay Act was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex.[12]  Title VII, on the other hand, forbids discrimination on the basis of gender, race, or national origin in a wide range of employment practices, including hiring, firing, training, and promoting.[13]

*Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) (footnotes in original).

   **1.  Equal Pay Claim**.    The plaintiff establishes a prima facie case under the Equal

Pay Act

---

[12]  The Equal Pay Act provides, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

[13]  Title VII states, in relevant part:

(a) It shall be an unlawful employment practice for an employer –
    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
    (2) to limit segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e- 2.

by showing that the employer paid employees of opposite genders different wages for equal work for jobs which "'require equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Iirby v.* Bittick, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 223, 2228, 41 L.Ed.2d 1 (1974) and 29 U.S.C. § 206(a)(1)). Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex." The burden to prove these affirmative defenses is heavy and must demonstrate that "'the factor of sex provided *no basis* for the wage differential.'" Further, the employer must show that none of the decision-makers, whether in middle or upper management, were influenced by gender bais. Although an employer may not rely on a "*general practice*" as a factor "other than sex," it may consider factors such as the "'unique characteristics of the same job; ... an individual's *experience*, training or ability; or . . . special exigent circumstances connected with the business.'" . . . Once the employer's burden is met, the employee "must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential."

*Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003) (footnote citations omitted) (emphasis in original). *See also Miranda*, 975 F.2d at 1532-32; *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994); *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 546-47 (11th Cir. 1991); *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991); *Equal Employment Opportunity Comm'n v. White & Son Enters.*, 881 F.2d 1006, 1009 (11th Cir. 1989).

Byrd compares her position as Assistant Vice Chancellor for Student Affairs to the positions of Executive Director of Advancement and Alumni Services,[14] Assistant Vice

---

[14] The Executive Director of Advancement and Alumni Services position is held by Paul Alexander.

Chancellor for Academic and Graduate Affairs,[15] Dean of the School of Continuing Education,[16] and the Executive Director of University Outreach.[17]  In order to survive summary judgment, Byrd must establish a prima facie case of pay disparity under the Equal Pay Act.  To do so, Byrd must compare her job to the jobs held by these male employees. The prima facie case requires a comparison of jobs, not the skills and qualifications of the individuals who hold the jobs.  *Miranda*, 975 F.2d at 1533.  The plaintiff must show that the jobs are substantially equal.  *Id.*[18] In opposition to summary judgment, Byrd describes the comparison as follows.

> All senior administrators that Dr. Byrd compares herself with have the same core responsibilities as supervision and management of staff, title and reporting structure, ability to hire, fire and evaluate staff, budget responsibilities, impact on the University, the role that each unit impacted the University, and the scope of that role.

(*Pl's Br. in Opp. to Summ. J.* at 14-15).  In essence, she contends that these individuals are appropriate comparators because

> we are a group of those senior administrators that I feel are performing the same core tasks.  We're on planning and budget together.  We are on strategic planning.  We are on administrative council.  Again, those oversight bodies, policy decision making bodies that impact the university.  We represent our areas, but we have the same common essential functions.

---

[15]  Dr. Judd Katz holds this position.

[16]  Dr. Alan Hackel holds this position.

[17]  Dr. John Veres held this position until his appointment as Chancellor.

[18]In *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998), the court uses in the same paragraph the terms "substantially equal" and "substantially equivalent."  There is no real difference and the terms should be considered synonymous.

(Byrd Dep. at 204).

The problem with this argument is that general similarities are insufficient for Byrd to meet her burden. The EPA has a strict similarity requirement.

> The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high. When Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other." The restrictions in the Act were meant "to apply only to jobs that are substantially identical or equal." *Brennan v. City Stores, Inc.*, 479 F.2d 235, 358 (5th Cir. 1973) (footnote omitted). Similarly, in *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256 (5th Cir. 1972), the court stated "[b]y substituting the term 'equal work' for 'comparable work,' which was originally suggested, Congress manifested its intent to narrow the applicability of the Act." *Id.* at 1258. Congress intended to permit employers wide discretion in evaluating work for pay purposes. *Id.* Thus, although employees do not have to prove jobs are identical, they have the heavy burden of proving "substantial identity of job functions." *Id.*

*Waters v. Turner, Woods & Smith Ins. Agency*, 874 F.2d 797, 799 (11th Cir. 1989). *See also Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994). Consequently, the court must compare each comparator position to Byrd's position to determine whether they are "virtually identical, that is, . . . very much alike or closely related to each other." *Waters, supra.*

    a. *Dr. Byrd - Assistant Vice Chancellor for Student Affairs*. The Assistant Vice Chancellor for Student Affairs reports to the Vice Chancellor for Academic and Student Affairs. The duties of this position include administrative responsibility for "admissions, career development, financial aid, housing, registrar/records, and student development." (Def's Ex. A-8). The Assistant Vice Chancellor also supervises persons in these areas.

12

In addition, the Assistant Vice Chancellor develops a budget for student affairs, "represent[s] student needs to the central administration, while implementing existing policy," and is responsible for "the educational and the social experiences of students as the latter relate to campus life." (*Id*.). Finally, the Assistant Vice Chancellor serves as the Chair of the Student Discipline Committee for violations of social policy.

    *b. Paul Alexander - Executive Director of Advancement and Alumni Services*.  Byrd asserts that her position is comparable to the Executive Director of Advancement and Alumni Services.  The Executive Director position's essential responsibilities include: "[m]anage, lead, and conduct major gift development, annual funds, capital campaigns, and oversee stewardship of gifts; [a]dminister and direct Alumni Affairs; [p]articipate in and contribute to various non-development events and campus committees; [and] [s]erve as a liason between the Auburn Development Office and AUM." (Def's Ex. 1-A).  The position reports directly to the Chancellor, and the incumbent supervises one to six employees.

One essential function of this position is to raise funds for AUM.  Fund-raising goals are set by the Chancellor and require specific financial gifts to be committed to the University each year.  The Executive Director is also responsible for coordinating capital campaigns, working with community leaders and others, to develop gift proposals.  In addition to the fund raising responsibilities, the Executive Director is responsible for building and maintaining alumni support.

Although Byrd insists that her position is comparable to Alexander's, the court concludes that the positions are not so "virtually identical" to be comparable for EPA

purposes.  Although Byrd and Alexander both have budget responsibilities, Byrd concedes

that budget issues are a larger part of her position and involves "multiple units" while

Alexander's position is responsible for a single unit and smaller, less complex budget.  (Byrd

Dep. at 195, 197, 201).  Byrd also concedes that Alexander's position requires fund raising

while her position does not.  (*Id*. at 198).  Alexander does not recruit students while student

recruitment is one of Byrd's primary responsibilities.  (*Id*.)  Byrd concedes that her position

also differs from Alexander's because he interacts with people other than students while she

interacts primarily with students.  (*Id*. at 201).  Thus, the court concludes that Alexander's

position as the Executive Director of Advancement and Alumni Services is not sufficiently

alike to be a valid comparator, and with respect to Alexander's position, Byrd has failed to

establish a prima facie case under the EPA.

   *c.  Dr. Judd Katz - Assistant Vice Chancellor for Academic and Graduate Affairs*.

The Assistant Vice Chancellor for Academic and Graduate Affairs reports to the Vice

Chancellor for Academic and Student Affairs and is responsible for the "maintenance of

program quality and its improvement, including the review of programs and curricula and

the coordination, planning and development of undergraduate and graduate offerings in

conjunction with academic departments and schools."  (Def's Ex. A-3).  The Assistant Vice

Chancellor for Academic and Graduate Affairs serves as the Chair of the Student Discipline

Committee for violations of academic policy.

   The Assistant Vice Chancellor for Academic and Graduate Affairs also serves as the

Dean of Graduate Studies, Vice Chancellor Designee Co-Chair of the Curriculum Committee

and Graduate Council, and the University's representative on the Alabama Commission on Higher Education's Council of Graduate Deans.  (*Id.*)

The essential responsibilities of the position of Assistant Vice Chancellor for Academic and Graduate Affairs revolve around matters of academic programs and curricula. Byrd asserts that her position is comparable to Dr. Katz because they have the same title and they both report to the Vice Chancellor for Academic and Student Affairs.  (Byrd Dep. at 201 & 205).  She concedes that Katz has no direct budget responsibilities and that his position was "a very different position . . . [w]ith very, very different duties and job responsibilities" from her position.  (*Id.* at 198-99).  Byrd also concedes that Katz does not have the same supervision and management of staff responsibilities as her.  (*Id.* at 205).  In light of these admissions, the court concludes that Byrd has failed to demonstrate that Katz's position required equal responsibility or is sufficiently alike to be a valid comparator, and, thus, has failed to establish a prima facie case under the EPA.

*d. Dr. Alan Hackel - Dean of the School of Continuing Education.*  The Dean of the School of Continuing Education reports to the Vice Chancellor for Academic and Student Affairs.  The primary responsibility of this position is "to support the University's commitment to offer lifelong learning opportunities to individuals and organizations in the community, state and beyond" by "interact[ing] with faculty, administration, and leaders in Montgomery and surrounding communities in an effort to establish and maintain good public relations . . . and to assist with the promotion of programs and activities offered through the University's School of Continuing Education."  (Def's Ex. A-4).  The Dean "oversees the

15

administrative operations of the school, including staff selection, supervision and evaluation, as well as budget preparation and management and unit planning." (*Id*.)

The Dean is responsible for overseeing the programs at the School of Continuing Education which include professional certification programs, computer training programs and other courses and conferences. Because the School is financially self-supporting, the Dean is responsible for ensuring that sufficient funds are generated to maintain the School.

Byrd asserts that her position is comparable to Dr. Hackel's position because they serve on many of the same committees, they are both considered management and they have the same "core tasks." (Byrd Dep. at 203). Again, she concedes that their positions at AUM are unique and that there is "not going to be another me. There is not going to be another him, not at a university. There's one of each." (*Id*. at 204). In her position, Byrd is responsible for handling issues involving students' needs including admissions, records and financial aid. She reports, however, to the Vice Chancellor of Academic and Student Affairs. In his position, Hackel has complete administrative and oversight responsibility for the the School of Continuing Education. Because the School is self-supporting, Hackel is also responsible for securing sufficient funds to maintain the program. Consequently, as the Dean of the School of Continuing Education, Hackel's position required more responsibility than Byrd's as Assistant Vice Chancellor and his position is not sufficiently similar to Byrd's to be a valid comparator. Thus, the court concludes that Byrd has failed to demonstrate that her position is comparable to Hackel's and has failed establish a prima facie case under the EPA.

*e. Dr. John Veres - Executive Director of University Outreach*. The Executive

Director of University Outreach is responsible for University Outreach which encompasses four Centers: Center for Advanced Technologies, Center for Business and Economic Development, Center for Demographic Research and Center for Government and Public Affairs.  University Outreach and its Director are tasked with "helping companies, public agencies, and individuals expand their professional knowledge and prepare for the challenges of the future."  (Def's Ex. A).

Essential duties of the Executive Director include generating business and negotiating contracts for University Outreach, as well as coordinating and managing major public relations events and community service projects.  In addition, the Executive Director "[d]irect[s] and oversee[s] the individuals who plan, direct, and evaluate the operational, financial and personnel activities of Outreach staff and functions." (Def's Ex. A-5).  The Executive Director is the "principal technical consultant" on EEO and litigation related matters for AUM.  (*Id.*).  A major component of the position of Executive Director involves external contact within the local business community, building relationships and interacting with businesses, governmental agencies and others to enhance AUM's reputation.

The Executive Director directly supervises the Associate Director and four Directors of the individual Centers and indirectly supervises approximately 50 Outreach employees and a number of subcontractors.  The Executive Director reports directly to the Chancellor.

Byrd asserts that her position is comparable to both Dr. Hackel and Dr. Vere's positions because

we are a group of those senior administrators that I feel are performing the

17

> same core tasks.  We're on a planning and budget together.  We are on
> strategic planning.  We are on administrative council.  Again, those oversight
> bodies, policy decision making bodies that impact the university.  We
> represent our areas, but we have the same common essential functions. . . .
> core responsibilities . . . The supervision aspect, the ability to hire, fire,
> evaluate staff, budget responsibility, impact on the university, the role that
> your unit impacts the university.  I guess, the scope of that role, and again, that
> connects to impact on the university.

(Byrd's Dep. at 205-06).

Veres is responsible for oversight and management of four educational centers that focus on the needs of companies, public agencies and communities.  He negotiates business contracts and generates business for University Outreach.  His budgetary and supervisory responsibilities are much greater than Byrd's.  Veres reports directly to the Chancellor and has great autonomy in the daily operations of University Outreach.  Consequently, Veres' position as Executive Director requires more responsibility than Byrd's as Assistant Vice Chancellor and his position is not sufficiently similar to Byrd's to be a valid comparator.  Thus, the court concludes that Byrd has failed to meet her burden of establishing that her position as Vice Chancellor of Student Affairs was substantially similar to the Executive Director of University Outreach and has failed establish a prima facie case under the EPA.

Thus, Byrd has failed to demonstrate that any genuine issue of fact exists from which a reasonable fact finder could conclude that her position was "virtually identical, that is, . . . very much alike or closely related" to the positions of her comparators.  *Waters, supra*.  Indeed, Byrd's "core tasks" argument expose the fallacy of her arguments.  While a prima facie Equal Pay Act case must focus solely on the primary duties of each job, most if not all

18

senior administrative jobs will include planning, policy making and budgeting responsibilities. Those duties do not define the job; rather, those duties are generally inherent in every administrative position. If Byrd's argument were correct, the Equal Pay Act would require that every administrator be paid the same; obviously that absurd result is not what Congress intended. Each of Byrd's comparators had different primary duties. The defendant is entitled to summary judgment on her Equal Pay Act claim.

**2**. **Title VII Claim**. "To recover for disparate treatment, the employee must prove that the employer intentionally discriminated against her." *Mitchell*, 936 F.2d at 546. The plaintiff can establish a prima facie case of intentional discrimination by presenting (1) direct evidence of discriminatory intent; (2) sufficient evidence to satisfy the circumstantial evidence test set out in *McDonnell Douglas*, *supra*; or (3) statistical proof of intentional discrimination. Because Byrd has not presented the court with any direct evidence of discriminatory intent or statistical proof,[19] the court analyzes her discrimination claims within the *McDonnell Douglas* framework. Consequently, Byrd's Title VII disparate pay claim is properly governed by the familiar tripartite framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dept. of Cmty Affairs v. Burdine,* 450 U.S. 248 (1981); *Meeks,* 15 F.3d at 1018; *Miranda*, 975 F.2d at 1528; *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).

In an employment discrimination case, the plaintiff bears the ultimate burden of

---

[19]  Although Byrd provides the court with a number of salaries, she concedes that the data is simply raw numbers she took from budget books. (Pl's Dep. at 37-38). This data, standing alone, is simply insufficient as a matter of law to constitute statistical data.

proving that the defendant intentionally discriminated against her.  *Burdine*, 450 U.S. at 253.
This Circuit has consistently held that federal courts, in resolving discrimination claims, do
not review the accuracy of an employer's decision.  *See e.g., Jones v. Bessemer Carraway
Med. Ctr.*, 151 F.3d 1321, 1321 n.16 (11th Cir. 1998) (explaining that "Title VII is not a
shield against harsh treatment at the workplace. . . .The employer may fire an employee for
a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long
as its action is not for a discriminatory reason." and citing *Nix*, 738 F.2d at 1187.)  To be
successful, the plaintiff must first prove, by a preponderance of the evidence, a prima facie
case of discrimination.  *Burdine*, 450 U.S. at 252-53.

A plaintiff may establish a Title VII prima facie claim of pay disparity by showing
that she is a female and that her job was substantially similar to higher paying jobs occupied
by men.  *Mulhall*, 19 F.3d at 598.  *See also  Miranda*, 975 F.2d at 1526.  If the plaintiff
establishes a prima facie case, then the second step of the burden-shifting analysis requires
the employer to rebut the presumption of discrimination by demonstrating a legitimate, non-
discriminatory reason for the pay disparity.  *Id.*, at 1529 (citing *Burdine*, 450 U.S. at 255-56).
The defendant's burden is "exceedingly light." *Id.*  Once the employer has met its burden of
production, the burden shifts back to the plaintiff for the final step in the analysis where, to
avoid summary judgment, the plaintiff must rebut the employer's proffered reasons and
demonstrate that a genuine issue of facts exists about whether its proffered reason is a pretext
for sexual discrimination.  *Meeks*, 15 F.3d at 1019-21.  "To rebut an employer's legitimate
nondiscriminatory reasons for its adverse action, the employee must produce evidence which

directly establishes discrimination or which permits the jury to reasonably disbelieve the employer's proffered reason." *Hudson v. Mr. Burch Formal Wear, Inc.*, 2006 WL 2351837, *2 (11th Cir. 2006) (quoting *Steger*, 318 F.3d at 1079).

Byrd argues that as Assistant Vice Chancellor for Student Affairs, she was paid less than males in comparable positions. Again, she relies on Paul Alexander, Judd Katz, Alan Hacket, and John Veres as comparators. Byrd was hired in 1997 at a starting salary of $60,000. Alexander was hired in 1999 at a starting salary of $78,390. Katz, who has been employed at AUM since 1971, became the Assistant Vice Chancellor for Academic and Graduate Affairs in 1994. His starting salary in that position was $68,000. Hackel was hired as the Dean of the School of Continuing Education in 1993. His starting salary was $65,000. Veres, who has been employed by AUM in a variety of capacities since 1978, was hired as the Executive Director of University Outreach in 2000. His starting salary was $104,200.

The defendant argues that the plaintiff's claim fails because she is unable to establish a prima facie case of discrimination. However, even if the court were to conclude that Byrd had established a prima facie case of gender based discriminatory pay disparity, she has failed to demonstrate that AUM's legitimate and non-discriminatory reasons for the pay disparities were pretextual. Assuming that Byrd has established a prima facie case, the burden shifts to the Board to provide a legitimate, non-discriminatory reason for the differences in pay. According to the defendant, the differential in salaries between the men and Byrd are the results of position, prior relevant work experience, market data, and longevity. Alexander was "a highly qualified, in-demand candidate in an increasingly high-

demand field." (Def's Ex. A at 2, ¶ 5).  He had "significant development and fund-raising experience and a proven track record in a high-level position." (*Id.*).  Katz has been employed by AUM since 1973 and had experience working as the Associate Director for Graduate Affairs.  (*Id.* at 4, ¶ 6).  Hackel was hired in 1993 as Dean  for the School of Continuing Education.  Prior to his employment at AUM, Hackel had been employed as a dean of continuing education for another university.  (*Id.* at 5, ¶ 7).  Veres has worked at AUM since 1978 in a number of capacities.  (*Id.* at 6, ¶ 8).

Katz has been employed at AUM for many years when he was hired as Assistant Vice Chancellor of Graduate Affairs.  Hackel had prior relevant experience as a Dean when he was hired at AUM.  Veres had been employed at AUM for twenty-two years when he was hired as Executive Director of University Outreach.  Although Byrd has two years more experience at AUM than Alexander, Alexander brought significant fund-raising experience from his previous experience as Senior Vice President/Chief Operating Officer with Baptist Health.[20]  The law in this circuit is clear.  "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997).  Moreover, the defendant's burden is "exceedingly light." *Miranda*, 975 F.2d at 1529.  The court concludes that AUM has met its burden of producing legitimate, non-discriminatory reasons for the pay

---

[20]  Byrd alludes to the fact that Alexander may have been downsized from his position at Baptist Health.  Regardless of why Alexander left Baptist Health, the undisputed evidence demonstrates that he brought with him a vast array of fund-raising experience.

disparities between Byrd and the male employees to whom she compares herself.

Having determined that the defendant presented sufficient evidence of a legitimate, non-discriminatory reason for the pay disparities, the burden now shifts to Byrd to present evidence that AUM's reasons are pretextual.  "If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  To survive summary judgment, Byrd now "must demonstrate that a discriminatory reason more likely than not motivated [AUM] to pay her less, or that [AUM's] explanation is not worthy of belief." *Miranda*, 975 F.2d at 1529.  It is at this juncture that her claim fails.  Byrd has come forward with no evidence to suggest that AUM's reasons are pretext for gender discrimination.  Her own unsubstantiated opinion that the salary decisions made by AUM were somehow motivated by gender is not an appropriate proxy for evidence.

Byrd asserts that "[t]here is no reasonable explanation for the disparity other than overt gender discrimination because the justification presented is false."  (Pl's Br. in Opp. to Summ. J. at 44).  This conclusory argument is not an appropriate substitute for evidence nor does the argument of counsel rise to the level of admissible evidence.  Byrd does not point to or otherwise provide the court with any evidence to substantiate her allegations.  Her rhetoric, with no attendant facts, is simply insufficient to defeat summary judgment.  It is conclusory and self-serving without providing any factual bases to support her position.

In evaluating a plaintiff's evidence of pretext, the court is not required to agree with the employer's proffered reasons for the employment decision.  Instead, the crucial question

is whether the employer was motivated by a racially discriminatory bias.  *See e.g., Standard v. A.B.E.L, Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) (citing *Combs*, 106 F.3d at 1538).  Byrd offers no evidence, other than her own speculative opinion, that the disparities in pay are motivated by gender discrimination.  Byrd has presented no concrete evidence in the form of specific facts to support her claim of intentional gender-based  discrimination. She cannot rely on her own unsubstantiated opinion that the salary decisions were somehow motivated by gender.  "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment."  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529  (11th Cir. 1987).  *See e.g.*, *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value); *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment.").  The mere fact that these men were paid more than her is insufficient to establish pretext.  Thus, Byrd has failed to demonstrate that any genuine issue of fact exists from which a reasonable fact finder could conclude that AUM's reasons for paying her less than her comparators was pretextual or that AUM intended to discriminate against her on the basis of her gender.  The defendant is entitled to summary judgment on this claim.

### B.  Retaliation Claim.

Byrd also asserts a separate claim of retaliation pursuant to Title VII.[21]  In order to

---

[21] Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of

establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) she participated in protected action or expression; (2) "a reasonable employee [in her position] would have found the challenged action materially adverse 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination;'" and (3) there is a causal connection between the protected activity and the adverse action. *Burlington Northern & Santa Fe Railway Co. v. White*, ___ U.S. ___, 126 S.Ct. 2405 (2006).  *See also Hulbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir.2006); *Olmsted v. Taco Bell Corp*., 141 F.3d 1457, 1460 (11th Cir. 1998).  It is not necessary for the plaintiff to prove the underlying discrimination claim, provided that the plaintiff has "a good faith belief" that she had been the victim of discrimination.  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000); *Meeks,* 15 F.3d at 1021.

> If the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action.  If the defendant does so, to avoid summary judgment, the plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude that each of the employer's proffered reasons is pretextual.

*Arnold v. Tuskegee University*,  2006 WL 3724152 (11th Cir. Dec. 19, 2006) (No. 06-11156) (citations omitted).

Moreover, "[t]he anti-retaliation provision protects an individual not from all

---

his employees or applicants for employment ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (1982)

retaliation, but from retaliation that produces injury or harm." *Burlington*, ___ U.S. at ___,

126 S.Ct. at 2414.  The challenged action must be *materially* adverse because the Court

"believe[d] it is important to separate significant from trivial harms."  *Id*. at 2415.  The

standard the court applies is that of the "reactions of a *reasonable* employee."  *Id*.

Byrd alleges that she was treated with hostility, her work performance was criticized

and she received critical and offensive emails from her supervisor and others in

management.[22]  Specifically, Byrd complains that while she received positive ratings on her

evaluation in April 2005, her supervisor "took the opportunity to turn that positive rating into

a negative by the comments that he made."  (Pl's Dep. at 74).  She felt that the evaluation had

"a very negative tone" and that her supervisor's comments were "digs."  (*Id*. at 75).  Byrd

concedes that she has no evidence that this evaluation had any adverse effect on her

employment.  (*Id.* at 77).

Byrd also complains about a directive from her supervisor to "cease and not

correspond further regarding staff classification and compensation plan without first going

---

[22]  Although Byrd has argued that the initial investigation into her complaint of pay discrimination was retaliatory, her deposition testimony belies this position.  When asked, Byrd specifically stated that the investigation was not retaliatory, it was "just not thorough."  (Pl's Dep. at 31).

More importantly, even assuming Byrd was now complaining about the thoroughness of the investigation conducted by Foster, her claim would fail as a matter of law.  In *Baldwin v. Blue Cross/Blue Shield of Ala.*, ___ F.3 ___, 2007 WL 805528, *14 (11th Cir. Mar. 19, 2007) (No. 05-15619), the Eleventh Circuit concluded that when investigating claims of sexual harassment, the employer is only required to conduct a reasonable investigation.  A reasonable investigation "does not include a requirement that the employer credit uncorroborated statements" of the employee. *Id.*, at *13.  A reasonable investigation "may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business."  *Id.* at *14.  In this case, Foster spoke with Byrd's supervisor and others, inquired of other institutions and looked at market information.  (Foster Dep. at 16 - 24).  Under the circumstances, this investigation was reasonable.  *See Baldwin, supra.*

through him." (*Id*. at 78).  According to Byrd, this directive was retaliatory because it "undermined her authority." (*Id*. at 92).  Although Byrd complains that this directive prevented her from complaining about her salary, it is clear that the directive was related to staff compensation and did not extend to her salary concerns.  Moreover, Byrd acknowledged that her supervisor sent the directive because he "did not like conflict [and] . . . just wanted [the problem] to go away." (*Id*. at 91).

She complains that she received a memo challenging the manner in which scholarships were awarded because the scholarship account had a $300,000 deficit. (*Id*. at 92-93).  According to Byrd, the memo accused her of overspending the account. (*Id*. at 94).  Byrd does not dispute that the account was operating at a deficit but argues that previously there had been no limit on the funds and if an account was in the deficit, money was simply transferred into the account.

Finally, Byrd alleges that AUM changed how it reported her position to CUPA to report her at a lower position in retaliation for complaining about gender-based pay discrimination.  She asserts that this retaliatory conduct began in 2004, shortly after she complained of salary inequities and continued until she was retired in 2006.  According to Byrd, "the downgrading of my position marked a $36,000 difference in pay when compared to my previous classification.  When AUM reclassified me, this act capped my wages at a lower level and ended my potential to grow my salary.  It also denied me the opportunity for market salary adjustments." (Declaration Sherryl Byrd at 3, ¶ 7, doc. # 47).  The problem with this argument is it is purely speculative and not grounded in fact.  It is undisputed that

27

Byrd's salary was not reduced as a result of or in conjunction with her reclassification to CUPA.  In fact, in 2003, when Byrd was classified as Chief Student Affairs Officer, her salary was $77,000.  In 2004 when she was first classified as Associate Student Affairs Officer, Byrd received a pay raise of $3300 and was making $81,000, an increase of 4.2475%.  In 2005, Byrd was again classified as Associate Chief Student Affairs Officer. That year, she received a pay raise in the amount of $7000, an increase of 8.642%, to raise her salary to $88,000.  Following her reasoning, Byrd appears to be arguing that this pay raise was effectively a retaliatory action on the part of her supervisor.  To the contrary, this evidence more directly demonstrates that Byrd was not denied raises and her salary was not capped as a result of the CUPA reclassification.  Moreover, the undisputed evidence demonstrates that AUM does not base salaries or raises solely on CUPA data.  In short, Byrd presents no evidence, other than her own speculative belief, that her wages would somehow be affected by this reclassification.

More importantly, Byrd presents no evidence to dispute the fact that she was properly classified as the Associate Student Affairs Officer and improperly classified as the Chief Student Affairs Officer for CUPA's purposes.  There is simply no credible evidence before the court to demonstrate that Byrd suffered any adverse employment action as a result of the reclassification, or that the reclassification was suspect in any way.

Applying the *Burlington material* adversity and *reasonable* employee standard to the facts of this case, the court concludes that Byrd's complaints do not rise to the level of materially adverse actions that would dissuade a reasonable person from complaining about

discrimination. *Burlington*, *supra*. At best, Byrd suffered what may be termed "personality conflicts," "petty slights," or "minor annoyances." *Burlington*, 126 S.Ct. at 2415. Byrd's complaints that she was treated with hostility and criticized, that she received offensive emails and directives, and that her classification to CUPA was changed are the types of "trivial conduct" not designed to be protected by the anti-retaliation provision of Title VII. *Id*. at 2416. The plaintiff points to no evidence of any protected activity objectively materially adverse sufficient to establish a prima facie case of retaliation. Accordingly, the court concludes that the defendant's motion for summary judgment on Byrd's retaliation claim is due to be granted.

A separate final judgment will be entered.

## V. CONCLUSION

Accordingly, for the reasons as stated, it is

ORDERED and ADJUDGED as follows:

1.     That defendant's motion for summary judgment (doc. # 26) be and is GRANTED.

2.     That defendant's motion to strike (doc. # 42) and motion in limine (doc. # 59) be and are hereby DENIED as moot.

Done this 17th day of April, 2007.


        /s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE